UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM PURNELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 1:22-cv-02426-SEB-MJD |
| | ) |
| LONG ELECTRIC COMPANY, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendant's Motion for Summary Judgment [Dkt. 45]. Plaintiff William Purnell brought this action against his former employer, Defendant Long Electric Company, Inc., alleging that Defendant laid him off because of his race in violation of 42 U.S.C. § 1981. For the reasons detailed below, we <u>DENY</u> Defendant's summary judgment motion.

**Factual Background**

Plaintiff William Purnell is an African American man who is a member of the International Brotherhood of Electrical Workers ("IBEW") Local 725 Union ("Local 725" or "Union"). Burnworth Dep. at 15–19. Defendant Long Electric Company, Inc. ("Long"), which is headquartered in Indianapolis, Indiana, provides electrical subcontracting work for various commercial construction projects. Chlystun Decl. ¶¶ 4–5. At all times relevant to this litigation, Jeff Chlystun has served as an Owner and the President of Long. *Id.* ¶¶ 2–3.

**Defendant's Hiring Practices Under the Collective Bargaining Agreement**

For its projects located in central Indiana, a contractor such as Long acquires electricians through a collective bargaining agreement with the Local 725. The contractor typically places a call to the Union for electricians who are available to answer and accept the new work. The Union then puts out a call to its members who have indicated that they need work by signing the Local 725 books located in the union hall. Based on the Union's collective bargaining agreement, electricians who are local to the Union's area are prioritized as "Book 1" electricians who will nearly always receive an automatic offer for local work, if they elect to answer the call. A call for a project may extend over a few months to several years, depending on the amount of work required to complete a particular project. If an employing contractor winds up having more electricians on a job than necessary, given the amount of work to be completed on a project, the contractor may reduce its work force for that project by laying off electricians. After such a reduction in force, a Union electrician is given what is called a "clean layoff" from a project, allowing the electrician to either immediately seek new work on other projects through the Union based on another call or to collect unemployment compensation.

**Plaintiff's Hiring and First Day on the Job**

In April 2019, Long had subcontracted with a general contractor, Messer Construction Co. ("Messer Construction"), to perform electrical work for the McNutt residence hall and dining facility on the campus of Indiana University of Bloomington, Indiana (the "McNutt Project"). As President and an Owner of Long, Mr. Chlystun, who

rarely personally visited the McNutt Project job site, delegating the day-to-day operations of that project to Labor Superintendent Tim Dunnegan, General Foremen Joe Dunnegan and David Burnworth, and various other foremen, including Marc Duncan.

In early March 2021, Long placed a call to the Local 725 seeking additional electricians for the McNutt Project. Mr. Purnell, an inside wireman journeyman who was Book 1 with the Local 725, answered Long's call to the Union and was chosen for the job. Mr. Purnell turned out to be the only African American electrician to work for Long on the McNutt Project; his direct supervisor was Mr. Duncan.

On March 9, 2021, when Mr. Purnell arrived for his first day on the jobsite, he was met in the parking lot by Foreman Burnworth. After accepting Mr. Purnell's referral papers from the Union, Mr. Burnworth departed the site, apparently in a vehicle, leaving Mr. Purnell to traverse on foot four uphill city blocks to reach the job site. Once Mr. Purnell arrived at the jobsite, Mr. Burnworth directed him to watch an orientation video provided by the general contractor, Messer Construction. Following the video, Mr. Purnell was given Long's employment handbook and asked to complete new hire paperwork. According to Mr. Purnell, the entire process lasted "[a]s quick as we could fill out paperwork, and maybe about four or five minutes after that." Purnell Dep. at 18.

**Employment Handbook Policies**

Long's employment handbook included Long's Safety Rules and Regulations, which document included the following list of acts of misconduct that could prompt disciplinary action or a discharge: "[i]nsubordination, including refusal promptly to obey a supervisor's orders or to perform any assigned work," "[e]xcessive or unexcused

absenteeism or tardiness …," "[f]ailure to report for work without notifying or obtaining permission from your foreman or member of management at least 30 minutes prior to your assigned starting time," and "[l]eaving Company premises or leaving your assigned work area during work hours without permission of your supervisor."  Dkt. 46-4 at 7–9.  The Safety Rules and Regulations also outlined the procedure by which an employee was required to notify Long if they are going to be absent or tardy from work, including an instruction that employees phone the Long office and leave a message to be forwarded to the respective foreman, rather than contact the jobsite or the foreman directly.  *Id.* at 9 ("Calling the jobsite or Foreman directly is not acceptable for the primary contact to report an absence."); Dkt. 46-6 at 4–6.

**Plaintiff's Work Performance**

Mr. Purnell's "tool buddy" or "work partner" on the McNutt Project was Ryan Bland, a Caucasian man.  Bland Decl. ¶ 4.  Mr. Purnell and Mr. Bland shared tools and performed all their work together such that the finished product embodied the combined work of both men.  *Id.* ¶ 5.  Mr. Bland was never informed that the electrical work he and Mr. Purnell performed on the McNutt Project failed to meet Long's standards.  *Id.* ¶ 7.  On one occasion, when Mr. Purnell's supervisor, Mr. Duncan, was asked by Mr. Burnworth how the electricians—including Mr. Purnell—were working out, Mr. Duncan reported that he was "getting work out of [Mr. Purnell" and that Mr. Purnell was "doing what he was supposed to be doing."  Duncan Dep. at 29.

**Early Departure from Worksite**

On March 12, 2021, three days after Mr. Purnell began working on the McNutt Project, he, and Mr. Bland, were prevented from performing any work at the jobsite due to their not having the necessary materials to complete the work. Mr. Bland informed Mr. Purnell that he was going home, and Mr. Purnell decided to do the same since he was unable to perform any work without his partner and the materials required for the job. The pair agreed that while Mr. Purnell cleaned up their tools, Mr. Bland would inform their supervisor that they were going home early. As agreed, Mr. Bland informed their foreman, Mr. Duncan, and the general foreman, Mr. Burnworth, that he and Mr. Purnell were both leaving early, in response to which neither Mr. Duncan nor Mr. Burnwork voiced any objection.

During Mr. Purnell's drive home that afternoon, he missed Mr. Duncan's phone call due to a disrupted phone signal. Thus, Mr. Duncan left a voicemail as well as sent a text instructing Mr. Purnell that he was supposed to inform Mr. Duncan or Mr. Burnworth if and when he planned to leave early. Mr. Purnell returned Mr. Duncan's call to explain that Mr. Bland had assumed responsibility for providing notice of his and Mr. Bland's early departure. Mr. Duncan advised Mr. Purnell that Mr. Burnworth was upset about the situation, so Mr. Purnell took care to apologize to Mr. Burnworth the following Monday when he returned to work. Mr. Burnworth's response was a simple, "Okay," and Mr. Purnell received no verbal or written discipline for having left early. Purnell Dep. at 28–29.

**Use of Designated Break Areas**

On March 15, 2021, an employee of Messer Construction reported to Mr. Burnworth that he had observed Mr. Purnell sitting, with the lights off, in a breakroom designated for PCI Carpentry ("PCI") contractors. His use of this specially designated space was not permitted. Even so, Mr. Purnell was not disciplined for having used the PCI breakroom, and, in fact, Mr. Burnworth never addressed the situation at all with Mr. Purnell. According to Mr. Purnell, no one informed him that Long employees were required to take breaks in a specially designated area and were not permitted to take their breaks in other contractors' designated areas. Her therefore admitted that he occasionally used the PCI breakroom after the regular crew had left, to have some privacy. This was a time when many concerns existed regarding COVID-19, in response to which employees spread out from one another and took breaks in various places, *i.e.*, outside near the front entrance, in the hallway, near their workplaces, or in the basement.

Having been unaware of any rule about designated breakrooms, Mr. Purnell on another occasion spent his break sitting with the lights off in the empty room generally used by PCI contractors. As he sat in the darkened room, Mr. Duncan and Mr. Burnworth together walked up the hallway and shone a light through the window. Mr. Purnell heard them whispering, laughing, and saying things such as, "I can't see him," "it's too dark," and "I can only see his feet." Purnell Dep. at 32–33. Despite observing Mr. Purnell in the room designated for PCI contractors, neither Mr. Burnworth nor Mr. Duncan asked him to leave the room, disciplined him, wrote him up, or directed him to rest in the area designated for Long employees. *Id.*

**Late Arrival to Worksite**

On March 17, 2021, Mr. Purnell texted Mr. Duncan at 5:24 a.m. to report that he would be late to work that morning. Mr. Duncan replied, "When you get here come find me so you can sign in please." Exh. G. When Mr. Purnell arrived at the jobsite that morning, approximately four hours after his scheduled start time, he realized that he had inadvertently left his hard hat behind in his vehicle, which was parked in the lot located approximately a mile away designated for Long employees.[1] Due to the distance between the jobsite and the parking lot, Mr. Purnell asked Mr. Duncan to drive him back to his car to get his hard hat, and Mr. Duncan agreed to do so. According to Mr. Duncan, Long employees, at the end of their work shifts, are supposed to wear their hard hats to their cars, so it was not unusual for employees on occasion to forget their hard hats when they returned to work and have to return to their cars to retrieve them. Duncan Dep. at 39. Mr. Duncan testified that he agreed to drive Mr. Purnell back to the parking lot to get his hard hat because it was such a "long way" back to the lot. *Id.*

On March 23, 2021, Mr. Purnell called Mr. Duncan at 8:01 a.m. to report that he had just arrived at work, approximately one hour late, for his expected start time. Mr. Purnell had not provided Mr. Duncan any advanced notice that he would be late that morning, as was required by Long's employment handbook. Nonetheless, Mr. Purnell was not disciplined for this tardiness. According to Mr. Duncan, it was not unusual for employees to call him directly if they were going to be late, even though the Safety Rules

---

[1] Mr. Duncan testified that there must have been an athletic event on campus that day requiring Long employees to park farther away from the job site.

7

and Regulations direct that employees instead should call the Long office and leave a message, which is then passed along to their foreman. Despite Long's employment handbook directive otherwise, Mr. Duncan supplied his phone number to his employees with instructions to call or text him if they were running late, so he could report it to Long. Duncan Dep. at 40.

Mr. Purnell was not the only Long electrician ever to report late for work. According to Mr. Bland, he himself was four to five hours late to work on March 22, 2021, and, during his time working for Long, he noticed that there would be some electrician who was late or absent every week. Bland Decl. ¶ 10. Mr. Burnworth testified that another Caucasian electrician, Jody Allen, had a history of attendance issues. Burnworth Dep. at 25. As far as we have been informed, neither Mr. Bland nor Mr. Allen was disciplined for their attendance derelictions.

**Parking in Non-Designated Parking Lots**

When Mr. Purnell began working for Long, he concedes that he did not always park in the designated authorized lot. Long employees were directed to park in the purple parking lot on days when there was a home Indiana University basketball or football game; otherwise, they were to park in the green lot. If Long's employees parked somewhere other than the designated lots, they were subject to being ticketed or towed at their own expense. According to Mr. Duncan, once he advised Mr. Purnell of the permissible parking lot assignments for electricians, Mr. Purnell thereafter parked in the assigned lot(s).

**Lunch Breaks**

Shortly after Mr. Purnell began working for Long, the superintendent of Messer Construction (the general contractor) informed Mr. Burnworth that he had observed on a few occasions Mr. Purnell returning late from lunch. Mr. Burnworth testified that all employees on the McNutt Project had a designated lunch break from noon to 12:30 p.m. each day. On March 24, 2021, after being alerted to the issue by Messer Construction, Mr. Burnworth noted Mr. Purnell's time when returning to work from lunch as being around 12:40 p.m., as he was carrying an outside restaurant cup in his hand. Mr. Burnworth testified that he did not observe Mr. Purnell leave for lunch that day so he does not know the precise time his lunch break began—whether it was right at noon or later, but he assumed it was on time because otherwise he would have been paid time and a half for having worked into his lunch hour. Mr. Purnell denies that he ever took more than his allotted 30-minute lunch break, and claims in any event that he was never told that he was supposed to eat lunch from noon to 12:30 p.m. only. Such a rule had it existed would not have made sense because it was not always possible to stop work abruptly for lunch exactly at noon each day.

**The March 17 Meeting**

On March 17, 2021, Mr. Chlystun visited the McNutt Project jobsite to meet with the project foremen and other leaders (the "March 17 Meeting"). Prior to the March 17 Meeting, Mr. Chlystun knew and planned to communicate to the McNutt Project leadership, including to Mr. Dunnegan, Mr. Burnworth, and Mr. Duncan, that Long would be filing a delay (of work) claim against Messer Construction because the general

9

contractor was not staying on schedule for completion of the McNutt Project. As a result of these delays, there were too many electricians working on the jobsite for the amount of work that was available to be performed. Mr. Chlystun thus understood when he arrived at the jobsite for the March 17 Meeting that, due to the delays, Long would need to reduce its workforce for the McNutt Project.

At 11:30 a.m., when the March 17 Meeting was scheduled to begin, Mr. Duncan was not in attendance. When Mr. Chlystun inquired as to Mr. Duncan's whereabouts, Mr. Burnworth informed him that Mr. Duncan was driving an electrician (Mr. Purnell), who had arrived late to work that day, back to his vehicle to retrieve his hard hat. Mr. Chlystun was also informed that, during the brief time Mr. Purnell had worked for Long, he had created several attendance issues, had been found spending breaks in areas other than Long's designated break area, had parked in lots not designated for electricians, and on multiple occasions had taken more than 30-minute lunch breaks.

Mr. Chlystun testified that, although he had come to the March 17 Meeting intending only to meet and talk with the foremen and did not plan to initiate any layoffs at that time, he grew concerned about Messer Construction's various complaints regarding Mr. Purnell's performance (his returning late from lunch and using break areas not designated for Long employees) because he feared that "the first thing [Messer Construction] would point out" in the event Long filed a delay claim against the company was Mr. Purnell's failures. Dkt. 46-1 at 3. Mr. Chlystun thus informed Mr. Dunnegan, Mr. Burnworth, and Mr. Duncan (who had by then joined the meeting) that a reduction in force would be necessary for the McNutt Project due to Messer Construction's inability to

remain on schedule, prompting the group to discuss and determine which electrician should be laid off first.

There is some discrepancy in the evidence before us regarding who ultimately made the decision to lay off Mr. Purnell. Mr. Chlystun testified that, after learning of the issues regarding Mr. Purnell's workplace conduct during his brief tenure on the McNutt Project, Mr. Chlystun concluded that Mr. Purnell should be the first electrician laid off, directing the Long foremen in attendance at the March 17 Meeting to provide Mr. Purnell with a "clean layoff." At the time the layoff decision was made, Mr. Chlystun had never met Mr. Purnell, personally observed his work, or reviewed any of his employment records and was wholly unaware of Mr. Purnell's race.

Mr. Burnworth, however, testified that it was Mr. Dunnegan who made the layoff decision. According to Mr. Burnworth, Mr. Dunnegan (not Mr. Chlystun) informed him and Mr. Duncan that Long needed to reduce manpower on the McNutt Project and that he, Mr. Dunnegan, and Mr. Duncan had discussed amongst themselves who should be let go. Although Mr. Duncan initially recommended another Long employee, Jody Allen, who had created attendance issues, the group ultimately decided on Mr. Purnell because Mr. Allen had been with Long "quite a bit longer" than Mr. Purnell, and, unlike Mr. Purnell, had no other workplace deficiencies beyond his attendance-related ones. Burnworth Dep. at 23–26.

**Plaintiff's Layoff**

On March 25, 2021, approximately one week after the March 17 Meeting, Mr. Duncan approached Mr. Purnell at his assigned work area to inform him that he was

being laid off and to provide him an envelope that included a payment check for the work Mr. Purnell had completed on the McNutt Project.  The reason for the layoff was written in Mr. Purnell's Notice of Separation, to wit, "reduction in workforce."  That was the only explanation provided to Mr. Purnell at that time.  Duncan Dep. at 12–13; Purnell Dep. at 15.  However, Mr. Duncan testified that he was told that Mr. Purnell had been chosen for layoff because of his issues with tardiness and failure to do "what he was supposed to be doing during work hours …."  Duncan Dep. at 9.

As Mr. Purnell was leaving the jobsite after learning of his layoff, he encountered a Book 2 employee from New York, Bob Koffer, who was still working on the McNutt Project, along with a temporary employee, Mike Hendricks, who was retired.  Mr. Purnell became angry when he realized that he had been laid off before either Mr. Koffer or Mr. Hendricks.  Under the collective bargaining agreement, as a Book 1 employee, Mr. Purnell should have had priority over Book 2 employees and temporary workers.  Before he left the jobsite, Mr. Purnell went to Mr. Burnworth's office and told him: "If I found out [you] had anything to do with singling me out, I [am] going to beat your butt."  Purnell Dep. at 50.  According to Long, Mr. Purnell threatened to "beat [Mr. Burnworth's] ass."  Burnworth Dep. at 18–20.  After this encounter, Mr. Purnell departed the jobsite and contacted his Union business agent who confirmed to him that Book 2 employees and temporary workers should have been laid off before he was.

The following day, on March 26, 2021, Mr. Purnell returned to the McNutt Project jobsite having been told by his Union representative that the check Long had issued to him was short and he wanted to receive his full payment as due.  At the jobsite, after

speaking with Mr. Duncan, Mr. Purnell encountered Mr. Burnworth, which turned hostile with each man yelling at the other and using expletives. Mr. Purnell attempted to goad Mr. Burnworth into fighting him, but the situation deescalated before it turned physical. After receiving a second check for the remainder of the wages Long owed him, Mr. Purnell left the jobsite without further encounters or incident.

**Additional Layoffs and Rehiring**

The day after Mr. Purnell's layoff, on March 26, 2021, Todd Thacker, the Business Manager for the Local 725, learned that Long had laid off Mr. Purnell while retaining both Mr. Koffer, a Book 2 member from another jurisdiction, and Mr. Hendricks, a temporary worker. Pursuant to the Union's collective bargaining agreement, in a reduction in force, temporary employees and Book 2 employees from other jurisdictions may not retain their positions in preference over full-time Book 1 employees from the local jurisdiction, such as Mr. Purnell. Mr. Thacker informed Long that the company needed to reinstate Mr. Purnell or lay off Mr. Koffer and Mr. Hendricks. Rather than rehire Mr. Purnell, Long elected to lay off Mr. Koffer. Mr. Hendricks, who was already retired, left the McNutt Project voluntarily.

Between March and April 2021, ten to twelve other electricians employed by Long, including Mr. Purnell, were laid off as part of the reduction in force. Despite the layoffs, Long maintained a standing order with the Local 725 seeking workers to perform the same type of electrical work that Mr. Purnell had performed on the McNutt Project. In May 2021, Long rehired Mr. Koffer to return to perform electrical work on the McNutt Project.

Long never rehired Mr. Purnell. After his layoff, Mr. Purnell at the advice of his Union business agent elected not to perform any electrical work for any employer until June 2022, when he took a job with Cache Valley Electric. Since that time, Mr. Purnell has remained continuously employed by Cache Valley Electric since that time, working more hours per week than he had worked for Long.

**The Instant Litigation**

On December 19, 2022, following screening decisions by the Equal Employment Opportunity Commission and the Indiana Civil Rights Commission, Mr. Purnell filed his complaint against Long, alleging that he was terminated from his employment due to his race, in violation of 42 U.S.C. § 1981. Now before the Court is Long's motion for summary judgment, which is fully briefed and ripe for ruling.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

14

## II. Discussion

Mr. Purnell claims that he was terminated because of his race, in violation of § 1981. It is well-established that "the substantive standards and methods that apply to Title VII also apply to [Section 1981]." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013). Accordingly, "the analysis governing a Title VII claim and a Section 1981 claim are the same, and the cases discussing claims under either provision are instructive." *Manning v. IOM Health Sys., L.P.*, No. 1:21-cv-00360-HAB, 2024 WL 3373415, at *3 (N.D. Ind. July 10, 2024) (citing *Johnson*, 733 F.3d at 728). However, while Title VII claims require that race be a "motivating factor" of the adverse employment decision, § 1981 claims require that race be a "but-for cause" of the injury. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4 755, 759 (7th Cir. 2022).

An analysis of Mr. Purnell's claim therefore invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that, regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence

proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765. Here, Mr. Purnell has chosen to proceed under the *McDonnell Douglas* framework; thus, we follow his lead and analyze his case under that rubric.

Under the *McDonnell Douglas* framework, the plaintiff must first demonstrate a *prima facie* case that he (1) belongs to a protected class, (2) was meeting his employer's legitimate performance expectations, (3) suffered an adverse employment action, and (4) was treated worse than similarly situated employees outside the protected class. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). In a mini-reduction in force ("mini-RIF") case such as this, where the plaintiff's position is not eliminated altogether, but instead other employees absorb the duties of the terminated employee, the fourth prong of the *prima facie* case is satisfied by a showing that the employee's duties were absorbed by employees outside of his protected class. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008). Assuming that the plaintiff satisfies each element of his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action, at which point the burden returns to the plaintiff to show that the defendant's reason was pretextual. *McDonnell Douglas*, 411 U.S. at 802.

Here, Long does not challenge Mr. Purnell's *prima facie* case of discrimination but argues that it is nonetheless entitled to summary judgment in its favor because Mr. Purnell has failed to establish that Long's proffered nondiscriminatory reason for his layoff, to wit, that Long laid him off as part of a planned reduction in force because of his

workplace infractions, was pretextual. After careful review of the record, however, we find that Mr. Purnell has adduced sufficient circumstantial evidence, when viewed as a whole and in his favor, to create a triable issue as to whether the nondiscriminatory reason given for his layoff was in fact a pretext for discrimination.

Long's primary argument is that Mr. Chlystun's layoff decision could not have been based on discriminatory animus because he had never previously met Mr. Purnell and thus did not know he was African American. Even assuming that to be true,[2] Mr. Chlystun testified that he did not perform an independent investigation into Mr. Purnell's conduct but instead made the layoff decision based solely on the information provided to him by Mr. Dunnegan, Mr. Burnworth, and Mr. Duncan, all of whom *were* aware of Mr. Purnell's race. Under established Seventh Circuit law, when "a non-decision-making employee with discriminatory animus provide[s] factual information or input that may have affected the adverse employment action," *Miller v. Polaris Lab'ys, LLC*, 797 F.3d 486, 490 (7th Cir. 2015) (quoting *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 829 (7th Cir. 2014)), the plaintiff "may prevail—even without showing that the ultimate decisionmaker harbored discriminatory bias—by invoking the cat's paw theory of liability." *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) (ADEA context). Under a cat's paw theory, "[i]f the [formal decisionmakers] acted as the conduit of the [non-decisionmaker's] prejudice—his cat's paw—the innocence of the [decisionmaker]

---

[2] As detailed above, there is conflicting evidence in the record regarding whether Mr. Chlystun or Mr. Donnegan chose Mr. Purnell to be the first Long employee laid off as part of the reduction in force.

would not spare the company from liability." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

Here, the evidence establishes that Mr. Purnell was the only African American electrician on the McNutt Project and that he was the first Long employee laid off in the mini-RIF, despite his layoff being in direct contravention of the terms and protections of the collective bargaining agreement governing the parties' employment relationship. Mr. Purnell has also adduced evidence from which a reasonable jury could conclude that the types of infractions for which Mr. Purnell was ostensibly laid off were not of the sort that typically result in an adverse employment action. Given that he received no discipline, formal or otherwise, on any occasion, and, in many instances, was not even told that his conduct was inappropriate, a jury could conclude that they were insubstantial and perhaps contrived. The evidence also supports a reasonable inference that such infractions were not uncommon among Long's other employees on the McNutt Project, all of whom were white, including Mr. Bland and Mr. Allen, who shared Mr. Purnell's job duties and supervisors, yet neither was recommended for layoff.

Long contends that the high number of infractions committed by Mr. Purnell in the short time he was with the company distinguishes his conduct from his identified comparators such that they cannot be considered similarly situated employees. However, while similarly situated employees must be "directly comparable" in "all material respects," a comparator "need not be identical in every conceivable way," to be considered similarly situated. *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012). Here, we cannot say that standing alone the fact that Mr. Purnell may have had more infractions

18

than his comparators so differentiates his conduct that no reasonable jury could infer that Long's less favorable treatment of Mr. Purnell supports an inference of discrimination, particularly given the comparatively minor nature of those infractions.

In sum, viewing this evidence as a whole and in the light most favorable to Mr. Purnell, as we are required to do at the summary judgment stage, we hold that it could permit a reasonable jury to find that Long's foremen's singling out of Mr. Purnell and recommending him for layoff over Book 2 and temporary employees in contravention of the collective bargaining agreement based on relatively minor infractions common among similarly situated employees outside his protected class was because of his race. On the facts before us, determining whether such an inference of discrimination is appropriate "cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). Long, of course, will be free to present its nondiscriminatory explanation of its layoff decision to the jury at trial, but evaluating that explanation will require credibility determinations that cannot be resolved based only on the parties' written submissions. Accordingly, Mr. Purnell's § 1981 discrimination claim survives summary judgment.

**III.  Conclusion**

For the reasons detailed above, Defendant's Motion for Summary Judgment is <u>DENIED</u>.  The case will proceed accordingly.

IT IS SO ORDERED.

Date: _____7/19/2024_____          ____*Sarah Evans Barker*____
                                                                    SARAH EVANS BARKER, JUDGE
                                                                    United States District Court
                                                                    Southern District of Indiana

Distribution:

Amber K. Boyd
Amber K. Boyd Law
amber@amberboydlaw.com

Jaclyn Michelle Flint
RILEY BENNETT EGLOFF LLP
jflint@rbelaw.com

Donald S. Smith
RILEY BENNETT EGLOFF LLP
dsmith@rbelaw.com